## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

JANIE MARIE BROCK,                )
                                  )
    Plaintiff,                    )     Case No. 1:14-cv-00044
                                  )     Senior Judge Haynes
v.                                )
                                  )
CAROLYN W. COLVIN,                )
Acting Commissioner of Social Security,  )
                                  )
    Defendant.                    )

## M E M O R A N D U M

Plaintiff, Janie Marie Brock, filed this action under 42 U.S.C. § 405(g) against the Defendant Carolyn Colvin, Acting Commissioner of Social Security, seeking judicial review of the Commissioner's denial of her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

Before the Court is Plaintiff's motion for judgment on the record (Docket Entry No. 12) contending, in sum, that the Administrative Law Judge ("ALJ") erred by (1) failing to find that Plaintiff met or medically equaled Listings 12.05(B) or (C); (2) by incorrectly considering opinion evidence; (3) by failing to analyze all of Plaintiff's impairments and their severity; (4) by failing to perform a function-by-function analysis for the residual functional capacity assessment ("RFC"); (5) by failing to correctly consider Plaintiff's obesity; and (6) by finding Plaintiff was not credible. The Commissioner contends that the ALJ's decision is supported by substantial evidence.

After the evidentiary hearing, the ALJ evaluated Plaintiff's claim for SSI using the sequential evaluation process set forth at 20 C.F.R. § 416.920. (Docket Entry No. 10, Administrative Record

at 13).[1]

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 31, 2010, the application date, and that Plaintiff's earning record after the application date did not rise to the level of substantial gainful activity. Id. at 14.

At step two, the ALJ determined that Plaintiff has the following severe impairments: central disc protrusion with neural foraminal narrowing at L5-S1; midline pericallosal lipoma with partial agenesis of the corpus callosum, complete absence of the splenum of the corpus callosum, and mild colpocephaly; obesity; borderline intellectual functioning; learning disability; and bipolar disorder. Id.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 14.

At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform less than the full range of medium work that includes lifting and/or carrying fifty pounds occasionally and twenty-five pounds frequently; sitting, standing, and/or walking for six hours each during an eight-hour workday; occasionally climbing ramps and stairs, but never climbing ladders, ropes, or scaffolds; balancing, stopping, kneeling, crouching and crawling; the ability to perform simple, one-to-three step, routine, and repetitive tasks; occasionally interacting with the public and coworkers, but would work better with things rather than people; and not performing jobs that require reading or math. Id. at 18.

---

[1]The Court's citations are to the pagination in the Administrative Record, not in the electronic case filing system.

2

At step five, the ALJ stated that Plaintiff has no past relevant work, but that there are jobs that exist in significant numbers in the national economy that the claimant can perform. Id. at 22. The ALJ concluded that Plaintiff was not disabled within the meaning of the Act and was not entitled to benefits. Id. at 23. Following this decision, Plaintiff requested a review. Id. at 6-8. On January 30, 2014 the Appeals Council denied Plaintiff's request for review. Id. at 1-5.

## A. Review of the Record

Plaintiff's alleged onset date of disability is October 9, 2001. (Docket Entry No. 10, Administrative Record, at 110). Plaintiff's earliest submitted medical record is dated October 21, 2003. Id. at 281. Plaintiff has also included her education records. Id. at 211-17.

On March 9, 1998, the Henderson County Special Education Services produced a psychological report on the results of Plaintiff's IQ test. Id. at 212-13. Plaintiff's full scale IQ score was "79 +/- 3 on the [Wechsler Individual Achievement Test – Revised ("WAIS-R")] which places her at the Borderline Mentally Retarded level of intellectual functioning at the time of testing." Id. at 212. Due to her score, Plaintiff "appear[ed] to be eligible for services as learning disabled in the areas of basic reading, math reasoning, and math calculation[.]" Id. at 213. On March 9, 2001, the Marshall County Board of Education noted that Plaintiff is "learning disabled" and eligible for special education. Id. at 211.

On October 21, 2003, Plaintiff visited Marshall Medical Center ("MMC") for an MRI of her brain. Id. at 281. The MRI showed "a midline tumor that appears somewhat loculated and extends across the midline to the right and to the left and measures approximately 3 by 3.5 by 5 cm. diameter." Id. There was not any significant change when compared to her MRI on June 1999. Id. The doctor told Plaintiff that this was "a benign tissue tumor[.]" Id.

On February 20, 2004, Plaintiff visited MMC with her chief complaint that due to the "tumor on brain, [she] has bad headache, soa[re] throat" that had persisted for one month. Id. at 276-77. The medical record reflects "tumor benign" and Plaintiff was referred to a neurologist. Id. at 276-77.

On October 27, 2004, Plaintiff returned to MMC for a scheduled visit, but also complained of dizziness with nausea, depression, and nervousness. Id. at 283-84. On this visit, Plaintiff again mentioned her brain tumor and complained it was giving her headaches. Id.

On August 17, 2007, Plaintiff visited Dr. Kenneth Phelps for an initial consultation "to get established with the practice." Id. at 287-90. Plaintiff listed her occupation as a "homemaker" who was single, with one child. Id. at 287. Plaintiff reported "not exercising regularly" and "[f]ollow[ing] no specific diet." Id. Plaintiff complained of a backache. Id. at 288. Plaintiff was noted as "grossly obese body habitus" and "mildly distressed." Id. Plaintiff was also "anxious, [with a] noticeable change in energy levels, moody." Id. at 289.

On September 17, 2007, Plaintiff returned to Dr. Phelps for a follow up on her "back pain, anxiety." Id. at 291-93. Plaintiff explained that "the meds you gave her made her sick." Id. at 291. Upon examination, Plaintiff had "bilateral lower paraspinal muscle tenderness" and was "anxious, [with a] noticeable change in energy levels, moody, cried during the exam, mildly depressed affect." Id. at 292. Plaintiff was prescribed and counseled about anti-depressant medication, but "expressed her anxieties [about] life situations, became tearful, encouraged to call Centerstone. States current [medication] is not decreasing her depression and anger episodes." Id. at 293.

On January 22, 2008, Plaintiff returned to Dr. Phelps with a complaint of knee pain. Id. 296-98. Plaintiff's knee pain was described as "localized to the left knee, pain does not radiate." Id. at 296. The pain began a week before, and was "dull, moderate in degree" and produced "[s]tiffness[.]"

4

Id. Plaintiff was alleviating the pain by "stopping activity" and taking Ibuprofen. Id.

On January 22, 2008, Plaintiff was also scheduled for an appointment at Centerstone, but the appointment was cancelled by her therapist and rescheduled for February 19, 2008. Id. at 238. Plaintiff then cancelled her Centerstone appointments on February 19, March 3, March 13, March 14, and April 11, 2008. Id. at 253, 239, 244, 247 and 240.

On April 14, 2008, Plaintiff visited Dr. Phelps with complaints of "ear pain bilaterally, a sore throat, headaches, diarrhea" that she had experienced for three days. Id. at 300-02. Plaintiff was prescribed medication and a throat culture was taken. Id. at 302.

On May 19, 2008, Plaintiff's appointment at Centerstone was cancelled by her therapist and rescheduled for May 22, 2008. Id. at 245. Plaintiff cancelled her appointments at Centerstone on May 22 and July 24, 2008. Id. at 249 and 254.

On September 12, 2008, Plaintiff's care with Centerstone was terminated due to a "lapse in service" of "five months or over." Id. at 262-64. The administrative record does not include any records that Plaintiff visited Centerstone before September 12, 2008.

On September 29, 2008, Plaintiff was admitted by referral to MMC for her brain tumor. Id. at 229. Plaintiff underwent an MMR of her head. Id. at 306-08. Plaintiff's brain showed "a sizable midline pericallosal lipoma associated with partial agenesis of the corpus callosum. Complete absence of the splenium of the corpus callosum is present, there is mild associated colpocephaly. Correlation for any history of seizure activity or history of mental retardation." Id. at 306.

On December 9, 2008, Plaintiff visited Dr. Phelps with complaints of "sinus problems, a sore throat, a cough" that she had experienced for three to four weeks. Id. at 310-11. Plaintiff also reported back pain. Id. at 310. The physical examination showed "bilateral tympanic membrane

5

blisters" in Plaintiff's ears. Id. at 311. On this visit, Plaintiff was specifically "counseled regarding diet, regular sustained exercise for at least 30 minutes 3-4 times per week." Id.

On January 21, 2009, Plaintiff visited Dr. Phelps for "follow up evaluation of headache." Id. at 312-13. Plaintiff now reported that she "has been having these symptoms for years on and off." Id. at 312. It was noted again that Plaintiff had "bilateral tympanic membrane blisters" in her ears. Id. Plaintiff's nose "turbinates red bilaterally, turbinates swollen bilaterally, green nasal discharge noted bilaterally R>L." Id. at 313. Plaintiff's throat showed "mild erythematous oropharynx without exudate, cobble stoning noted on the posterior pharynx." Id. Plaintiff also had "a mobile, tender, enlarged lymph node noted in the anterior cervical chains bilaterally. The overlying skin is inflamed." Id. Plaintiff was given Hydrocodone tablets. Id. Plaintiff's headache was cited as "[w]orsening," and "[Plaintiff] [with] abnormal CT and brain lesion has never been evaluated by neuro and [headaches] have worsened[.]" Id.

On March 16, 2009, Plaintiff returned to Dr. Phelps for a follow up evaluation of her headaches. Id. at 315-16. Plaintiff "[c]omplain[ed] of a skin infection, anxiety, nervousness, insomnia, feeling depressed" and commented that her sister and her sister's child had moved in with her. Id. at 315. At this appointment, Plaintiff "appear[ed] greater than stated age" and was "poorly groomed," although this had not been an issue at previous appointments. Id. at 315-16.

On April 15, 2009, Plaintiff returned to Dr. Phelps for another follow up evaluation of her headaches and a medication refill. Id. at 317-18. On this visit, it is noted about Plaintiff's headaches that "neuro[logist] wanted to inject her for the neuralgia, but her insurance would not pay for this." Id. at 317. Plaintiff had "several [issues]" including "raising a difficult child" and "developmental issues her self." Id. According to the medical records, the "neuro[logist] felt her [headaches] may

be tension in nature and suggest we treat [with] antidepressants[.]" Id. Plaintiff cited increased stress, tension, and insomnia. Id. at 317-18. Again on this visit, Plaintiff was "poorly groomed" and "appear[ed] greater than stated age." Id. at 318.

On the April 15th visit, Plaintiff apparently brought her son to receive medical treatment as well. Id. at 317. The report stated, "[patient] is asking for help [with] her son, crying during the exam, has no help from any family members, lives in government housing and does not drive, has no hobbies or interest, to [follow up] [without] child so we can focus on her and be able to absorb education, [patient] is constantly leaving the room to get her child, visits are very [difficult] and [lengthy] [without] progress when she is seen back to back [with] her child [due to] his behavior issues and her parenting skills[.]" Id. at 318.

On May 7, 2009, Plaintiff returned to Dr. Phelps for a medication refill. Id. at 324-26. Plaintiff "[c]omplain[ed] of anxiety, feeling depressed, mood swings ... lower back pain and headaches." Id. at 324. Plaintiff was prescribed Buspirone for anxiety and a refill of Hydrocodeone-Acetaminophen for pain. Id. at 326.

On May 20, 2009, Plaintiff was admitted to the MMC emergency room. Id. at 222-28. Plaintiff described back and leg pain, but denied any injury. Id. at 222. Plaintiff reported her pain at a level of ten out of ten. Id. at 223. Plaintiff was noted to have anxiety and appeared to be in "moderate/severe" distress, but was otherwise within normal limits upon examination. Id. Plaintiff was discharged that day. Id. at 225.

On June 16, 2009, Plaintiff visited Dr. Phelps for a medication refill. Id. at 327-30. Plaintiff stated that she "wants to decrease her pain meds and try something different for her anxiety" and she was also "concerned about losing weight." Id. at 327. On this visit, Plaintiff's headaches were

"better." Id. at 328. Plaintiff experienced an onset of "dull, moderate" knee pain that began a week earlier. Id. at 327. Plaintiff also reported a sore throat. Id. Plaintiff's prescription for Buspirone for anxiety was discontinued, and Plaintiff was given a new prescription of Alprazolam, another anti-anxiety medication. Id. at 328. Plaintiff's prescription for Hydrocodone-Acetaminophen for pain was refilled. Id. Plaintiff was noted to have an "anxious, mildly depressed affect." Id. at 330.

On July 16, 2009, Plaintiff returned to Dr. Phelps for a medication refill. Id. at 331-33. Plaintiff had "[m]ultiple complaints" and it was noted that she "is having trouble with her apartment complex." Id. at 331. Plaintiff's current prescription for Alprazolam was refilled and she received a new presciption for Celexa, an anti-depressant. Id. at 331-32. It was noted that Plaintiff had a dental infection, but she was "unable to afford" care. Id. at 332.

On July 21, 2009, Plaintiff visited AJ Medical Services with complaints of "back pain, really bad [headaches], cough." Id. at 395. A note states, "See notes RE: Dr. Phelps refusing [patient] more Lortab this month," but there are not any such notes. Id.

On August 15, 2009, Plaintiff visited AJ Medical Services with complaints of "headaches, nausea, dizziness." Id. at 394.

On August 18, 2009, Plaintiff visited Dr. Phelps for a follow up regarding back pain. Id. at 337-40. On this visit it is noted that the office "HAD A CALLER STATE THAT [PATIENT] WAS SELLING MEDS[.]" Id. at 337. Plaintiff's prescriptions for Alprazolam, Celexa, and Hydrocodone-Acetaminophen were discontinued, and she was given a refill of Buspar, an anti-anxiety medication, and a new prescription for Citalopram Hydrobromide, an anti-depressant, at a higher dosage. Id. at 338.

On September 30, 2009, Plaintiff returned to Dr. Phelps with complaints of "chills, fever,

8

loss of appetite, a cough, headaches[,] body aches[.]" Id. at 342-44. On this visit, Plaintiff was taken off of pain management. Id. at 342. Plaintiff had a fever of 100 degrees, but the severity was described as "mild." Id. Plaintiff was not required to follow up and was "to return on an as needed basis." Id. at 344.

On February 6, 2010, Plaintiff visited AJ Medical Services. Id. at 393. Plaintiff complained of sinus congestion, sore throat and a slight cough. Id.

On March 11, 2010, Plaintiff visited Dr. Phelps with a headache, depression, and back pain. Id. at 351-52. On this visit, it is noted that Plaintiff "WAS FIRED FROM [PAIN MANAGEMENT] ABOUT 1 YR AGO[.]" Id. at 351. Plaintiff was described as "obese, in distress secondary to pain, anxious, [with] poor hygiene and fetid breath." Id. The diagnoses of Plaintiff's condition were "lumbago," "[adjustment] disorder with depressed mood," "depressive disorder," "esophageal reflux" and "acute frontal sinusitis." Id. at 352. Plaintiff was prescribed five new medications, including an anti-depressant and a pain medication. Id.

On August 17, 2010, Plaintiff visited Dr. Phelps with a headache and complaining of incontinence. Id. at 354-55. Plaintiff was prescribed three medications that did not include pain medication or anti-depressants. Id. at 355. Plaintiff was instructed to follow up in one month, and was encouraged to "[t]reat allergies, exercise-[appropriate] for your ability, stress reduction, adequate hydration and portion control exercise." Id.

On August 18, 2010, Plaintiff visited Centerstone. Id. at 233-37. For this appointment, Plaintiff stated that she "just need[ed] someone to talk to." Id. at 236. Plaintiff sought treatment for "depression." Id. Plaintiff reported that she "[d]oes not sleep (1-2 hours), [has] poor appetite, very poor memory and poor concentration, Frequent Difficulty adjusting to changes in her life (reported

she stays in same negative [patterns] because she does not like changes), Has a lot of [days] when she stay[s] in home and does not get out, avoids contact with others extensively, does not make food for self to eat or bathe. Reported she has been in this pattern for about 4 years and it is getting worse. [Plaintiff] stated she had come in for treatment for self, but [stopped] because she had to deal with her son." Id. Plaintiff was noted as having "pressured" speech and a depressed mood, with "appetite, crying, energy, interest, pleasure, sleep" "vegetative disturance[s]." Id. In summary, "[Plaintiff] is female in 29's coming for help with symptoms of depression. [Plaintiff] has no family support and poor social skills. [Plaintiff] was set up with CM services to help with social support, OP therapy with coping strategies and [medical evaluation] to help with symptoms. Due to poor family support and social [skills] only prediction of a fair outcome is predicted." Id. at 237.

Based on this visit, the Tennessee Clinically Related Group completed a functional assessment. Id. at 265-67. Plaintiff had moderate limitations in activities of daily living, marked limitations in interpersonal functioning, moderate limitations in concentration, task performance, and pace, and moderate limitations in adaptation to change. Id. at 265-66. Plaintiff was determined to be in "GROUP 1 - Persons with Severe and Persistent Mental Illness." Id. at 267. Plaintiff' current GAF score was noted as 48, with her highest score at 59 and her lowest score at 40. Id.

On August 31, 2010, Plaintiff visited Centerstone. Id. at 241-42. The progress note states: "[client] of centerstone, [not compliant] with [follow up] since [years]. [Single white female] lives with 8 [year old] son. [S]on draws SSI check and [patient] does odd jobs as clean apartment and at [laundromat]. [A]s per her she gets mood swings and most time gets depress[ed] and cries, feels helpless, lack of energy. [S]leep is poor and [appetite] is fine, she bite[s] her arms with teeth when gets angry. [N]o bit[e] marks at this time. [I]solates herself but [activities of daily living] fine. [G]ets

10

RT, gets talkative and talks fast and jumps and asked to slow down. [A]t times gets energy burst and do[es] hours of cleaning[]. [S]pends carelessly. [D]enies psychosis." Id. at 241. It was also noted that Plaintiff "do[es] ODD jobs as cleaning houses, do[es] house work, drive with no problem but this time has no car, [take] care of needs for [her] son." Id. Centerstone did not prescribe any new medications, although it was recommended that Plaintiff "restart [medications] and counsel for risk, benefits and safety issues." Id. at 242.

On September 2, 2010, Plaintiff applied for SSI. Id. at 110-16. Plaintiff's alleged date of disability was October 9, 2001. Id. at 110. On September 8, 2010, Plaintiff failed to show for her appointment at Centerstone. Id. at 246.

On September 10, 2010, Plaintiff visited Dr. Phelps complaining of a headache, elevated blood pressure, and back pain. Id. at 356-57. Plaintiff was prescribed medication for her headaches and a nasal spray. Id. at 357. Plaintiff was instructed to return in one month, and it was recommended that she "[t]reat allergies, weight reduction, anti-reflux diet, exercise-[appropriate] for your ability, stress reduction, calcium-V-d supplements, adequate hydration and portion control exercise." Id.

On September 13, 2010, Plaintiff's appointment at Centerstone was cancelled by her therapist. Id. at 252. On September 14, 2010, Plaintiff visited Centerstone. Id. at 250-51. Plaintiff reported "her [medications] helping and less mood swings and no anger and less depression and no anxiety. [S]leep and [appetite] are fine. [D]enies any stresses at this time." Id. at 250. At this time, Plaintiff reported working odd jobs as a cleaner. Id. Plaintiff was prescribed Celexa, an anti-depressant, and Haldol, an anti-psychotic medication. Id. at 251.

On October 6, 2010, Plaintiff visited Centerstone and for the first time met with Cynthia

Hanks, her case manager. Id. at 621-25. Plaintiff "did not know her diagnosis until case management told her today. [Client] stated that she knew she was depressed but did not know that she had bipolar disorder." Id. at 621. Plaintiff brought SSI paperwork and told Hanks that she had "been turned down several times." Id. Plaintiff was worried about her son's behavior, and Hanks "discussed with [client] even son is 8 almost 9 years old chronologically he is 2 or 3 developmentally." Id. Plaintiff showed "poor insight," a worrisome affect and a depressed mood. Id. at 621-22.

Plaintiff completed a function report with Hanks' assistance on October 6, 2010. Id. at 155-66. Plaintiff stated that "[m]y bipolar affects how I am unable to deal with people. I am depressed and want to isolate at home. My brain tumor causes me to have severe headaches. I feel tired and need to sleep to get my headaches to go away." Id. at 155. Plaintiff stated that before her illness, "I was able to work and function in society" and "I used to enjoy going outside. I used to enjoy going out with friends." Id. at 156, 163. When asked about medication, Plaintiff stated that her son, then eight years old, "tells me everyday to take my meds or I forget." Id. at 161. Plaintiff stated that she could not leave the house alone and that "[she] take[s] [her] son with [her]. [She is] fearful to go out alone." Id. at 162. As to getting along with others, Plaintiff wrote, "[p]eople tend to annoy me. They irritate me by talking" but "I used to like being with people." Id. at 164.

Regarding her abilities, Plaintiff wrote, "I have poor memory skills. I have difficulty concentrating and completing task. I have difficulty understanding information given to me. It is hard for me to follow directions because of my inability to concentrate. People irritate me by making noise, talking, etc." Id. Plaintiff listed the following abilities as affected by her illness: seeing, memory, completing tasks, concentration, understanding, following instructions, getting along with

12

others. Id. Asked how far she could walk before needing to stop and rest, Plaintiff answered "ten feet" and stated that "I have to rest at least 15 minutes due to my asthma." Id.

On October 12, 2010, Plaintiff cancelled her appointment at Centerstone because she "doesn't want to bring son, no one to watch him." Id. at 619-20.

On October 14, 2010, Plaintiff visited Dr. Phelps with a headache and back pain "[i]n addition, she presented with obesity." Id. at 358-59. It is noted that "[PATIENT] WAS FIRED [from pain management]." Id. at 358. Plaintiff was prescribed medications for headache, gastro-intestinal issues, heartburn, and weight loss. Id. at 359.

On October 18, 2010, Plaintiff visited Centerstone. Id. at 616-18. Plaintiff "state[d] she is meds compliant." Id. at 616. Plaintiff showed "poor insight." Id. Plaintiff also stated that "she has a hard time focusing due to brain tumor." Id. at 617.

On October 19, 2010, Plaintiff visited Centerstone. Id. at 611-15. Plaintiff showed slight improvement in her goals. Id. at 611. Plaintiff "reported she is sleeping better and medication is helping with anger outburst." Id. Plaintiff and her case manager "[t]alked about weight[ ]loss and dieting." Id. Plaintiff displayed "some insight." Id. Plaintiff reported "less mood swings and denie[d] depression and no anger[.]" Id. at 613. Plaintiff also reported that she "works part time." Id.

On October 21, 2010, Jayne F. Dubois, Ph.D., conducted a "psychiatric review." Id. at 364-77. The review was based on Plaintiff's "affective disorder" that was specified to be "bipolar II." Id. at 364, 367. Plaintiff was determined to have a mild restriction in "activities of daily living," a moderate restriction in "difficulties in maintaining social functioning" and "difficulties in maintaining concentration, persistence, or pace," but no "episodes of decompensation." Id. at 374.

13

Dr. Dubois concluded:

> "[Claimant] has [medically determinable impairment] consisting of bipolar II per
> Centerstone. This [medically determinable impairment] can possibly be expected
> to produce [claimant's] alleged [symptoms], but her statements concerning the
> intensity, persistence, and limiting effects are not supported by [medical evidence
> of record]. Therefore, [claimant's] report is considered partially credible. Current
> [medical history] [treatment] per Centerstone, [with] Intake dated 8-18-10. Most
> recent [medical history] [medical evidence of record] dated 9-14-10 indicate
> [positive] response to [medical history] [prescriptions], less anger, less depression,
> less mood swings, no anxiety, sleep/appetite fine, "denies any stresses at this time,"
> and [mental status exam] [is] [within normal limits]. [Medical history] [medical
> evidence of record] also indicate [claimant] does odd jobs cleaning houses. Per
> [activities of daily living], [claimant] care[s] for her 8 [year old] son, does limited
> self care, simple meals, drives, shops, tries to do [household] tasks, laundry,
> manages [money], attends church. No MSO to address. Totality of evidence is
> suggestive of [claimant] currently experiencing mild to moderate limitations from
> a [medical history] standpoint.

Id. at 376.

On October 21, 2010, Dr. Dubois completed a mental residual functional capacity

assessment. Id. at 378-81. Dr. Dubois found that Plaintiff was moderately limited in the following

abilities: the ability to understand and remember detailed instructions; the ability to carry out detailed

instructions; the ability to maintain attention and concentration for extended periods; the ability to

complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods; the ability to interact appropriately with the general public; the ability to accept instructions

and respond appropriately to criticism from supervisors; the ability to get along with coworkers or

peers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately

to changes in the work setting; and the ability to set realistic goals or make plans independently of

others. Id. at 378-79. Plaintiff was marked as having no limitation in all other categories, and none

14

of her limitations rose to the level of a marked limitation. Id. In the functional capacity section, Dr. Dubois wrote: "[claimant] can understand and remember simple and 1-3 step detailed tasks," "[claimant] can concentrate and persist for a two hour time period in an 8 hour day with customary breaks within the restrictions applied above," "[claimant] can interact appropriately [with] general public, coworkers & supervisors, within the restrictions applied above, but would work better [with] things than [with] people," and "[claimant] can set limited goals and adapt to infrequent change within the restrictions applied above." Id. at 380.

On November 2, 2010, Plaintiff visited Centerstone. Id. at 608-10. Plaintiff "state[d] she is meds compliant. [Client] state[d] that she feels the meds are working." Id. at 608. Plaintiff also said that she "is doing work on occasion around Maple Grove for spending money" because she had not heard "from disability" and her brother and sister-in-law were moving in with her. Id. Plaintiff's affect was flat and her mood was depressed. Id. at 609.

On November 15, 2010, Plaintiff cancelled her appointment at Centerstone because she "has to take friend to doctor." Id. at 606-07. On November 18, 2010, Plaintiff failed to show for another appointment at Centerstone. Id. at 605. Plaintiff's case manager attempted to reschedule several times. Id. at 603-04.

On November 28, 2011, Plaintiff visited MMC with complaints of constant lower back pain and stated that the pain affected her activities of daily living. Id. at 443-48. Plaintiff was discharged that day with instructions to apply a heating pad to her lower back. Id. at 445-46.

On November 29, 2010, Plaintiff visited AJ Medical Services with complaints of headaches, a "bad tooth that broke off," and lower back pain due to moving furniture. Id. at 392.

On November 30, 2010, Dr. Steven G. Steinberg of Disability Determination Services

conducted a case analysis. Id. at 383. Dr. Steinberg concluded that the "claimant appears credible" and that "[c]laimant's [high blood pressure] is non-severe." Id.

On December 6, 2010, Plaintiff visited Centerstone. Id. at 598-602. Plaintiff was not making progress with her goals. Id. at 598. Plaintiff was "stressed out due to family members moving in with her." Id. Plaintiff showed "some insight." Id. Plaintiff reported that "she still gets mood swings and gets snappy and gets loud and irritable, throw[s] things and broke her phone, as ... [father] of her son makes her mad." Id. at 600. Plaintiff's prescriptions were renewed and her prescription for Haldol, an anti-psychotic, was increased "for moods and anger." Id. at 601.

On December 7, 2010, Dr. M. Gumbinas of Disability Determination Services conducted a case analysis. Id. at 385. Dr. Gumbinas concluded, "the agenesis of the corpus callosum and the pericallosal lipoma are considered non-severe as the claimant's neurological examinations are entirely normal. She does have chronic tension headaches but these do not reach listing level severity as they have seldom required any specific treatment. ... The IM review by Dr. Steinberg concluded that the [high blood pressure] was non-severe and the orthopedic review by Dr. Medina concluded that the back pain was non-severe. Thus there are no severe medically determinable physical impairments in this claimant at the present time." Id.

Also on December 7, 2010, another case analysis was conducted by A. Medina of Disability Determination Services. Id. at 387. Medina concluded, "[c]laimant's obesity with no functional limitation is non-severe. Alleged back pain is non-severe. Claimant is not credible." Id.

On December 8, 2010, examiner K. Garcia completed a vocational analysis of Plaintiff. Id. at 171-73. Garcia noted Plaintiff's moderate limitations in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the

16

ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. Id. at 171. Garcia did not find any marked limitations. Id.

On December 10, 2010, Plaintiff visited AJ Medical Services with complaints of headaches and back pain. Id. at 391. Plaintiff requested a CAT-scan "to check on" her brain tumor. Id. That same day, Plaintiff also underwent a radiograph of her lumbar spine on referral from Dr. Phelps. Id. at 396. The radiograph showed "[n]o acute fracture of subluxation." Id.

On December 20, 2010, Plaintiff visited Centerstone. Id. at 594-96. According to her Centerstone records, Plaintiff "state[d] she is meds compliant. [Client] state[d] she feels her meds are working well at this time. [Client] state[d] she has been therapy compliant also." Id. at 594. After Plaintiff's SSI application was denied, Plaintiff's case manager helped her file an appeal. Id. The case manager stated that Plaintiff had "poor insight," a worrisome affect and an anxious mood. Id. at 594-95.

On December 22, 2010, Plaintiff visited Southern Physical Therapy. Id. at 427-28. Plaintiff reported injuring her back "4 weeks ago while rearranging her bedroom furniture." Id. at 427. At the time, Plaintiff was taking Lortab, a pain medication, and a muscle relaxer. Id. Plaintiff reported her employment as "do[ing] a little part-time cleaning work at her apartment complex." Id. Plaintiff

17

reported pain at a level of nine out of ten. Id. Plaintiff had "good" "rehab[ilitation] potential" and was scheduled to participate in physical therapy three times a week for three weeks. Id. at 428.

On December 29, 2010, Plaintiff cancelled her appointment at Centerstone because her brother was in the hospital and "[client] states she has been at the hospital all night." Id. at 593. On January 3, 2011, Plaintiff cancelled another appointment at Centerstone because she "is sick and does not have gas." Id. at 591.

On January 4, 2011, Plaintiff visited Centerstone. Id. at 588-90. Plaintiff "state[d] that she is taking her meds as prescribed." Id. at 588. Plaintiff's case manager helped her complete "paper[]work for SSI appeal." Id. Plaintiff had "poor insight." Id. Plaintiff's mood was anxious. Id. at 589.

On January 12, 2011, Plaintiff visited AJ Medical Services for a medication refill. Id. at 390. Plaintiff reported lower and mid-back pain and incontinence. Id.

On January 12, 2011, Plaintiff completed a disability report for her SSI appeal. Id. at 176-181. Plaintiff reported that "my anger management is worse. I worry more about things. I am very irritable" and "my headaches are worse. My back is in constant pain. My depression is worse." Id. at 176. Regarding activities, Plaintiff wrote that "I want stay and do nothing. I don[']t clean my house. I don[']t even feel like taking a shower" "I don[']t feel like going out any more." Id. at 179.

On January 24, 2011, Plaintiff visited Centerstone. Id. at 583-87. Plaintiff showed no improvement in her goals. Id. at 583. Plaintiff was "stressed out due to family members moving in with her. [Client] stated that they help very little and eat all her food. [Client] vented a lot during session." Id. Plaintiff had "some insight." Id. Plaintiff "still gets mood swings and gets argumen[ta]tive with her Ex. ... [S]till gets depress[ed], cries and feels helpless. [W]orries all the

18

time." Id. at 585. Plaintiff's prescriptions were renewed. Id. at 586.

On January 27, 2011, Plaintiff visited Centerstone. Id. at 580-82. Plaintiff showed some improvement in her goals. Id. at 580. Plaintiff "state[d] that she is more upset lately with her son's father. [Client] state[d] she 'snaps' at everything he says." Id. Plaintiff's case management helped Plaintiff complete paperwork for her disability application. Id. Plaintiff displayed poor insight, a flat affect and a depressed mood. Id. at 580-81.

Plaintiff and her case manager completed another function report. Id. at 185-92. Plaintiff wrote, "I have a difficult time getting along with people. When I am around crowds I become nervous and can't function. I have headaches due to my brain tumor. I easily forget things." Id. at 185. Plaintiff reported that her brother and sister-in-law, who were living with her at the time, "help me care for [my son]." Id. at 186. Plaintiff stated again that her son reminds her to take her medication. Id. at 187. Plaintiff stated that many household tasks were being taken care of by her brother and sister-in-law. Id. at 187-88.

Regarding activities affected by her illness, Plaintiff noted that she had trouble with lifting, bending, standing, walking, kneeling, memory, completing tasks, concentration, understanding, following instructions and getting along with others. Id. at 190. Plaintiff wrote, "[m]y back hurts so I have a difficult time doing physical activity. I have a hard time understanding information. I forget appointments and daily activities." Id. Plaintiff stated that she could walk for fifty yards before needing to stop and rest, and that she has to rest for fifteen to twenty minutes. Id. Plaintiff also wrote, "I have back problems now. I also have trouble with my legs. I am going to physical therapy to try and help my back and leg pain." Id. at 192.

On January 28, 2011, Plaintiff visited Southern Physical Therapy. Id. at 426. It was noted

that "Janie has completed her 9 prescribed [physical therapy] treatments. She has made significant improvement as she reports only minimal pain and shows significantly improved [active range of motion]. She has been able to perform strengthening and stabilization exercises without increased pain." Id.

On February 8, 2011, a psychiatric review was conducted. Id. at 403-15. Plaintiff's evaluation was based on her "organic mental disorders," "affective disorders," and "anxiety-related disorders," specifically "est [borderline intellectual functioning]," "bipolar II" and "[anxiety] [not otherwise specified]." Id. at 403-08. Plaintiff had a mild limitation in activities of daily living; a moderate limitation in maintaining social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation. Id. at 413. The review concluded, "report of [symptoms] credible, capable, reported physical problems, headaches, [difficulty] concentrating, [depression] [symptoms], some social [withdrawal] [especially] around crowds. [I]s able to care for household and community needs, is able to attend church. Based on all evidence in file, [moderate] limits, no [general] public." Id. at 415.

Also on February 8, 2011, a mental residual functional capacity assessment was conducted. Id. at 417-19. Plaintiff was moderately limited in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately

to changes in the work setting. Id. at 417-18. Plaintiff had one marked limitation, in the ability to interact appropriately with the general public. Id. at 418. In the functional capacity assessment, these comments are written: "able to understand and remember one, two and three step but not multistep instructions," "able to maintain attention, concentration, persistence and pace for above tasks for at least 2 hours despite periods of increased signs and [symptoms] and distraction around others," "should not interact directly with [general] public, able to interact with coworkers and supervisors on occasional basis," and "able to adapt to infrequent changes in the workplace." Id. at 419.

On February 11, 2011, Plaintiff visited AJ Medical Services for a medication refill. Id. at 425. On February 17, 2011, Plaintiff visited MMC. Id. at 440-42. Plaintiff underwent a lumbar MMR. Id. at 441. The MMR showed a "[s]mall central disk protrusion at L5-S1" but "[n]o significant stenosis." Id.

On February 22, 2011, Plaintiff visited Centerstone. Id. at 575-79. Plaintiff had not made progress on her goals. Id. at 575. Plaintiff "reported that her mood swings are creating relationship problems with her boyfriend of 13 years. [Client] stated she [snaps] on him constantly and is tired of this." Id. Plaintiff had "some insight." Id. Plaintiff stated that "her meds not helping as still gets mood swings and gets angry and argumentative, gets RT and also gets depress[ed], [cries] and feels helpless, lack of energy, stay in bed. [S]leep is ok and [appetite] is ok. [H]er husband calls her name[s] and degrades her and compare her with someone. [H]usband not spend any time with her and the son." Id. at 577. Plaintiff "drives with no problem and drove today." Id. Plaintiff's prescriptions were not renewed "until[] gets preg[nancy] test and is negative and gets depo [birth control] shot." Id. at 578.

On February 28, 2011, Plaintiff visited Southern Physical Therapy. Id. at 626-27. The note repeats the statement from January 28, 2011: "Janie has completed her 9 prescribed [physical therapy] treatments. She has made significant improvement as she reports only minimal pain and shows significantly improved [active range of motion]. She has been able to perform strengthening and stabilization exercises without increased pain." Id. at 626. Plaintiff was "[discharged] to [home exercise program] as patient has not returned to [physical therapy] over this past month." Id.

On March 9, 2011, Plaintiff visited AJ Medical Services for a medication refill. Id. at 422. On March 21, 2011, Plaintiff visited Centerstone. Id. at 572-74. Plaintiff "state[d] she has not been taking her meds because she thought she was pregnant. [Client] has been keeping scheduled therapy appointments." Id. at 572. Plaintiff had "poor insight." Id.

On March 22, 2011, Plaintiff visited Centerstone. Id. at 567-71. Plaintiff showed slight improvement in her goals. Id. at 567. Plaintiff "stated she is not seeing father of her son anymore" and "complained about his behavior as well as child['s] behavior." Id. Plaintiff had "some insight." Id. Plaintiff had "been [non-compliant] since few weeks as per her gets depress[ed] and less mood swings and no anger[.]" Id. at 569. Plaintiff's prescriptions were renewed and her prescription for Haldol, an anti-psychotic, was lowered. Id. at 570.

On April 1, 2011, examiner John Schlamp completed a vocational analysis of Plaintiff. Id. at 193-95. Schlamp found that Plaintiff was moderately limited in the following abilities: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and

22

to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately to changes in the work setting. Id. at 193. Schlamp also found that Plaintiff had one marked limitation: the ability to interact appropriately with the general public. Id. Schlamp determined that Plaintiff had no past relevant work but should be able to adjust to other work. Id. at 194-95.

On April 3, 2011, Dr. Joseph C. Curtsinger conducted a file review after Plaintiff's request for reconsideration. Id. at 421. Dr. Curtsinger notes that although "additional [activities of daily living] have been received and reviewed," there are "no significant changes between the [reconsideration] [activities of daily living] and initial [activities of daily living]." Id. In addition, although "worsening was alleged," the new medical evidence of record and the new activities of daily living "show no additional restrictions." Id. In conclusion, "review of records on the initial level have been reviewed which shows the initial decision was substantively and technically correct. [T]herefore the physical assessment of 12/07/10 is affirmed as written." Id.

On April 12, 2011, Plaintiff visited Centerstone. Id. at 564-66. Plaintiff showed "significant" improvement in her goals. Id. at 564. Plaintiff "state[d] she is meds compliant. [Client] attends therapy as scheduled." Id. Plaintiff "needed assistance in filing appeal on line for disability," and Plaintiff's case manager also drove Plaintiff to the doctor. Id. Plaintiff had "poor insight," a flat and worrisome affect, and a depressed and anxious mood. Id. at 564-65.

On April 12, 2011, Plaintiff visited Franklin Family Care Clinic. Id. at 638. Plaintiff complained of headache and back pain, and that "when knees are bent - legs fall asleep - painful pins + needles feeling." Id.

23

On April 13, 2011, Plaintiff completed a disability report for her SSI appeal. Id. at 198-204. Plaintiff wrote, "I cannot unbend my legs when I am sitting unless I take my hands and unbend my legs. My legs tend to 'fall out' from under me. My mental condition has gott[e]n worse. I cannot be around people because they upset me too much." Id. at 198. In additional remarks, Plaintiff wrote "I feel that leg, back, and neck pain prevent me from working. My mental health conditions keep me from functioning in society." Id. at 203.

On April 15, 2011, Plaintiff visited Centerstone. Id. at 561-63. Plaintiff showed some improvement in her goals. Id. at 561. Plaintiff "state[d] she is meds compliant. [Client] attends scheduled therapy appointments." Id.

On May 10, 2011, Plaintiff returned to Centerstone. Id. at 558-60. Plaintiff showed improvement in her goals. Id. at 558. Plaintiff reported that she "is meds compliant. However, [client] states that she feels meds do not always work for her. [Client] attends therapy sporadically." Id. Plaintiff's case manager drove her to the doctor and "provided support for [client] while at doctor." Id. Plaintiff had poor insight, a "flat" affect and a depressed mood. Id. at 558-59.

On May 10, 2011, Plaintiff visited Franklin Family Care Clinic for medication refills. Id. at 636. On May 23, 2011, Plaintiff visited Centerstone. Id. at 553-57. Plaintiff showed slight improvement in her goals. Id. at 553. Plaintiff reported that she "split from father of her child since last session." Id. Plaintiff was "still not very physically active, but is taking medication as prescribed." Id. Plaintiff "stated medication [was] working." Id. Plaintiff also reported that she was "less depress[ed] but still gets stress up her bad financial, she still misses her EX BF and cries and feels helpless. [N]o hopelessness ... [activities of daily living] fine." Id. at 555. Plaintiff was "better" since her last visit. Id. Plaintiff's prescriptions were renewed and her prescription for

Celexa, an anti-depressant, was increased "for her dep[ression] and moods[.]" Id.

On June 14, 2011, Plaintiff visited Franklin Family Care Clinic. Id. at 635. Plaintiff presented for medication refills and also "wants to start phentermine [a weight loss drug] again." Id. On June 22, 2011, Plaintiff cancelled her appointment at Centerstone because she "has to take a friend to somewhere." Id. at 551.

On July 12, 2011, Plaintiff visited Centerstone. Id. at 548-51. Plaintiff showed improvement in some of her goals. Id. at 548. Plaintiff "state[d] she has been taking her meds as prescribed. However, [case manager] did not see meds bottles or meds." Id. Plaintiff "fe[lt] her medication [was] working for her at this time." Id. Plaintiff displayed poor insight. Id. Plaintiff's case manager drove her to the doctor. Id.

On July 12, 2011, Plaintiff also visited Franklin Family Care Clinic for a follow up and medication refill. Id. at 634. Plaintiff was prescribed phentermine for weight loss, Lortab, a pain medication and Flexeril, a muscle relaxant. Id. Plaintiff "fe[lt] well" and had lost nine pounds. Id.

On July 19, 2011, Plaintiff visited Centersone. Id. at 545-47. Plaintiff reported that "she is 'alright.' [S]till gets depress[ed] and nervous and stress up as she off and on talks to her son's [father]. ... [G]ets snappy and aggr[a]vated but denies threatening and viol[e]nce." Id. at 545. Plaintiff's prescriptions were renewed and her prescription for Haldol, an anti-psychotic, was increased. Id. at 546.

On August 16, 2011, Plaintiff visited Centerstone. Id. at 542-44. Plaintiff was living with her brother and sister-in-law. Id. at 542. Plaintiff stated that she "broke up with son's [father] as he refuse to give her child support." Id. Plaintiff "denie[d] any mood swings and less anxiety, but still gets depress[ed] [especially] with [father] of her son, sleep is fine and [appetite] is fine. [N]o

psychosis. [N]o hopelessness[.]" Id. Plaintiff's prescriptions were renewed and she was "ask[ed] to take 30mg celexa at AM for 4 days as has 20mg tabs at home and th[e]n 40mg at AM for her depression and [anxiety.]" Id. at 543.

On August 20, 2011, Plaintiff visited the MMC Emergency Room. Id. at 434-39. Plaintiff complained of a toothache with radiating pain at a level of ten out of ten. Id. at 434. Plaintiff reported her medical history as "brain tumor," "back problems," "depression." Id. Plaintiff was discharged with the following instructions: "gingivitis," "tooth fracture," "[follow up] dentist ASAP." Id. at 435. Plaintiff was also given another prescription for Lortab. Id. at 436.

On September 13, 2011, Plaintiff visited Centerstone. Id. at 538-40. Plaintiff reported that "she is fine no anger and mood swings and denies anxiety and sleep and [appetite] are fine[.]" Id. at 538. Plaintiff reported she was "bet[t]er" since her last visit. Id. At this visit, Plaintiff's GAF score was reported as 48, with her highest score as 48 and her lowest score as 40. Id.

On September 16, 2011, Plaintiff failed to show for her appointment at Centerstone. Id. at 537. On September 29, 2011, Plaintiff visited Centerstone. Id. at 534-36. Plaintiff showed improvement in some of her goals. Id. at 534. Plaintiff's case manager drove her to the doctor and "provided advocacy and support during doctor's visit." Id. Plaintiff showed "poor insight." Id.

On September 29, 2011, Plaintiff visited Dr. Suellen Lee. Id. at 449. It was noted that Plaintiff was "here to establish [primary care physician]." Id. Plaintiff complained of "low back pain goes down left leg down to foot and says hurts bad in [left] heel." Id.

On October 18, 2011, Plaintiff underwent a CT scan of her lumbar spine. Id. at 430-31. Plaintiff showed a "[p]ersistent central disk protrusion and mild neural foraminal narrowing at L5-S1." Id. at 430.

On October 18, 2011, Plaintiff also underwent an MRI of her head. Id. at 432-33. Although the "[l]ack of IV contrast limits sensitivity of this study," the evaluation found "[n]o evidence of acute intracranial pathology" and "[s]table findings of partial agenesis of the corpus callosum with pericallosal lipoma[.]" Id. at 432.

On October 25, 2011, Plaintiff visited Dr. Suellen Lee. Id. at 449. Plaintiff presented for "check up [and] refills." Id. Plaintiff was "not feeling well coughing a lot" but "refused flu vac[cine]." Id.

On October 26, 2011, Plaintiff failed to show for an appointment at Centerstone. Id. at 533. Plaintiff's "[t]herapist called client who had forgotten the appt but will call back later to reschedule." Id. On October 31, 2011, Plaintiff failed to show for another appointment with Centerstone. Id. at 532. Plaintiff's "[case manager] went out for scheduled visit [client] was not home." Id. On November 3, 2011, Plaintiff cancelled her appointment at Centerstone because she was sick. Id. at 531. On November 8, 2011, Plaintiff failed to show for an appointment at Centerstone. Id. at 530. On November 18, 2011, Plaintiff failed to show for an appointment with Centerstone. Id. at 529. Plaintiff's case manager noted that "[client's] car was home but did not answer door when [case manager] knocked and rang bell." Id.

On November 29, 2011, Plaintiff visited Dr. Suellen Lee for "check up [and] refills." Id. at 450. Plaintiff complained of "increased back [and] leg pain." Id. Plaintiff was noted as having "back pain," "chronic pain," and "degen[erative] disc [disease]" although there is not a record of examination. Id.

On November 30, 2011, Cynthia Hanks from Centerstone visited Plaintiff at her home. Id. at 526-28. Plaintiff "state[d] she is meds compliant. However, [case manager] did not see meds

bottles or meds. [Client] attends therapy spor[a]dically." Id. at 526.

On December 5, 2011, Plaintiff visited Centerstone. Id. at 524-25. Plaintiff "reported her husband is attempting more visitation with her and their son, although she is suspicious of his true intentions." Id. at 524. Plaintiff also "reported she doesn't feel her meds are effective" and the therapist "point[ed] out the client is having to deal with situations that promote depression and anxiety." Id. Plaintiff showed "limited insight." Id.

On December 19, 2011, Plaintiff failed to show for her appointment at Centerstone. Id. at 523. On January 3, 2012, Plaintiff's appointment at Centerstone was cancelled by her therapist. Id. at 522.

On January 5, 2012, Plaintiff visited Centerstone. Id. at 519-21. Plaintiff "stated she is having difficulty maintaining a relationship with her son's father and the father's relationship with another couple." Id. at 519. Plaintiff was encouraged to "set up appropriate boundaries." Id.

On January 24, 2012, Plaintiff visited Centerstone. Id. at 513-18. Plaintiff showed slight improvement in her goals. Id. at 513. Plaintiff reported stress about a friend who had moved in and was not disciplining her children. Id. Plaintiff showed "less mood swing and less depression." Id. at 516. Plaintiff did "not like celexa" that she stated "made me more crazy," and made her "depress[ed] and nervous." Id. Plaintiff reported she "drives with no problem." Id. Plaintiff's prescription for Celexa was discontinued "as refuse to take and made her more moods and anxiety." Id. at 517. Plaintiff was prescribed Vistril, an anxiety medication. Id.

On January 24, 2012, Cynthia Hanks from Centerstone also visited Plaintiff at her home. Id. at 510-12. Plaintiff "state[d] the meds doctor changed her meds today. [Client] states her previous meds were not working. [Client] has been attending therapy." Id. at 510. Plaintiff reported being

"anxious" because she "let one of her friends and her two children move in with her." Id. Plaintiff

had "not heard from her attorney regarding her court date for disability," so she and Hanks called the

attorney together. Id. Plaintiff showed "very poor insight." Id.

On January 31, 2012, Plaintiff visited Dr. Suellen Lee for medication refills. Id. at 451.

Plaintiff also complained of neck pain. Id.

On February 6, 2012, Plaintiff failed to show for her appointment at Centerstone. Id. at 509.

On February 7, 2012, Cynthia Hanks from Centerstone visited Plaintiff at her home. Id. at 506-08.

Plaintiff "state[d] she is meds compliant. However, [case manager] did not see meds bottles or

meds. [Client] has been attending therapy." Id. at 506. Plaintiff reported that she "has two bedroom

apartment and five extra people living with her" so she "needed assistance applying for Section 8."

Id.

On February 17, 2012, Cynthia Hanks from Centerstone returned to Plaintiff's home. Id. at

503-05. Plaintiff "state[d] she is meds compliant. However, [case manager] did not see meds bottles

or meds. [Client] has been attending therapy." Id. at 503. Plaintiff needed help filling out an

application for Section 8 housing. Id. Plaintiff showed "very poor insight" and had "inadequate

social support." Id. On February 21, 2012, Plaintiff cancelled her appointment at Centerstone. Id.

at 502.

On February 28, 2012, Plaintiff visited Dr. Suellen Lee for medication refills. Id. at 451.

Plaintiff also complained of "back [and] neck pain" and "[s]inus problems." Id.

On February 29, 2012, Plaintiff visited Centerstone. Id. at 499-501. Plaintiff "state[d] she

is meds compliant. However, [case manager] did not see meds bottles or meds. [Client] attends

therapy." Id. at 499. Plaintiff was trying to find Section 8 housing. Id. Plaintiff showed "very poor

insight." Id.

On March 7, 2012, Plaintiff cancelled her appointment at Centerstone. Id. at 498. On March 8, 2012, Plaintiff visited Centerstone for an initial case management visit with a new case manager. Id. at 459-61. Plaintiff "denie[d] having co-occurring disabilities/disorders." Id. at 459. Plaintiff reported that she "continues to struggle with mood swings and not getting along well with others. [Client] has an abrasive personality and is verbally aggressive with those who cross her. [Client] just recently was charged with 'aggravated assault' and will go to court in June for hearing. [Client] reported that current medication is not helping her moods or ag[g]ression." Id. Plaintiff also noted her back pain, migraines, and brain tumor. Id. Plaintiff reported that she did not work for pay within the last seven days because she was disabled. Id. Plaintiff stated her treatment goal as "I need help with my impulsive anger," and the listed diagnosis for this issue was Bipolar II. Id. at 460. Plaintiff also stated that she "need[ed] help with disability" and that she "need[ed] to find a [primary care physician] and specialist who will help me manage my pain." Id.

On March 14, 2012, Plaintiff visited Centerstone. Id. at 495-97. Plaintiff "state[d] she is meds compliant. However, [case manager] did not see meds bottles or meds." Id. at 495. Plaintiff was trying to find Section 8 housing. Id. Plaintiff's affect was "worrisome" and her mood was "anxious." Id. at 496.

On March 20, 2012, Plaintiff cancelled her appointment at Centerstone because she was "trying to find home to move." Id. at 493-94.

On March 23, 2012, Plaintiff visited Centerstone. Id. at 490-92. Plaintiff was worried about finding Section 8 housing and completing disability paperwork from her attorney. Id. at 490. Plaintiff showed "poor insight." Id. Plaintiff's affect was "worrisome" and her mood "anxious."

Id. at 491.

On March 26, 2012, Carolyn Brace from Centerstone visited Plaintiff at home. Id. at 487-89. Plaintiff showed slight improvement in her goals. Id. at 487. Plaintiff was working on disability paperwork, and "struggled with comprehending the question[n]aire." Id. Plaintiff was also worried about finding Section 8 housing. Id. Brace wrote that Plaintiff had "limited intellectual function and comprehension." Id.

On March 27, 2012, Plaintiff visited Dr. Suellen Lee for medication refills. Id. at 452. Plaintiff complained of "[s]inus problems" but stated that her "neck pain - back pain a little better." Id.

On March 30, 2012, Plaintiff cancelled her appointment at Centerstone because "she had a family member die." Id. at 486. On April 11, 2012, Plaintiff visited Centerstone. Id. at 480-85. Plaintiff showed no improvement in her goals. Id. at 480. Plaintiff discussed problems with her son "displaying more defiant behavior at home[.]" Id. Plaintiff was encouraged to "allow [Continuous Treatment Team] services to resume." Id. Plaintiff also "stated she would monitor her own behavior such as calling [her son] names when she is ang[ry] with him. She will take time-outs for herself when she feels her anger building as to not take it out on [her son]." Id. Plaintiff also reported "less dep[ression]/no anger/mood swings" and that her "sleep and [appetite] fine. [N]o change in [weight]." Id. at 483. Plaintiff "drives with no problem" and had "no [symptoms] for [major depressive disorder]." Id. On this visit, Plaintiff's GAF score was reported as 60, with her highest score as 60 and her lowest score as 40. Id.

On April 24, 2012, Plaintiff visited Dr. Suellen Lee for medication refills. Id. at 452. Plaintiff stated she "[f]eels good" but was experiencing "[b]ack pain from moving." Id.

On April 30, 2012, Plaintiff failed to show for her appointment at Centerstone. Id. at 479.
On May 7, 2012, Carolyn Brace from Centerstone called Plaintiff "to see if we could visit today" but
there was no answer. Id. at 478.

On May 8, 2012, Carolyn Brace from Centerstone visited Plaintiff's home. Id. at 475-77.
Brace noted slight improvement in each of Plaintiff's goals. Id. at 475. Plaintiff had recently moved
"to country living from apartment living for her and family." Id. Plaintiff had also been charged
with assault on her mother and "state[d] that most of the claims are bogus and did not happen." Id.
Plaintiff also claimed she "has a $1000 deposit for electricity ... she has paid half but is not sure how
to come up with the rest as there were other deposits required to move in." Id. Plaintiff "expressed
a need for a new [primary care physician] as the current one is not attending to her physical health
needs appropriately." Id.

On May 10, 2012, Plaintiff cancelled her appointment at Centerstone because she "will be
out of town." Id. at 474. On May 14, 2012, Plaintiff's appointment at Centerstone was cancelled
by her therapist. Id. at 473.

On May 15, 2012, Plaintiff visited Centerstone. Id. at 470-72. Plaintiff did not show
progress in her goal to control her impulsive anger. Id. at 470. Plaintiff reported concern about
assault charges filed by her mother, "which she claims is false." Id. At this visit, "[c]lient was
pleasant and cooperative, actively participating in therapy but did become very tearful." Id.

On May 17, 2012, Carolyn Brace from Centerstone visited Plaintiff's home. Id. at 467-69.
Brace noted slight improvement in each of Plaintiff's goals. Id. at 467. Plaintiff was "[a]ngry, easily
irritated, fearful of losing vehicle, housing assistance, frustrated with relationships, confused,
emotional crisis mode." Id. Plaintiff complained that her brother and sister-in-law had moved out,

32

and that jeopardized Plaintiff's housing assistance payments. Id. Plaintiff planned to "bak[e] bread to sell at local fle[a] market to earn extra cash for this week['s] car payment." Id.

On May 22, 2012, Plaintiff visited Dr. Suellen Lee for medication refills. Id. at 453. Plaintiff was "[t]ired. Stressed out" and complained of "[l]ower back pain." Id.

On May 29, 2012, Plaintiff failed to show for an appointment at Centerstone. Id. at 466. Plaintiff "had forgotten about appointment" and "[s]he'll call back later tomorrow to reschedule." Id. On June 11, 2012, Carolyn Brace from Centerstone visited Plaintiff's home. Id. at 463-64. Brace observed slight improvement in each of Plaintiff's goals. Id. at 463. During their conversation, Plaintiff displayed an "outburst of angry epit[he]ts toward court system, land-lord, and mother. [I]rritated, cooperative, confrontational." Id. Plaintiff was "less stressed about finances right now because her brother/sister-in-law have moved back into the home." Id. Plaintiff also complained that she could not find "a [primary care physician] that will accept AmeriGroup and seriously address her disabling physical health issues." Id.

On June 12, 2012, Plaintiff failed to show for her appointment at Centerstone. Id. at 462.

On June 19, 2012, Plaintiff visited Dr. Suellen Lee for medication refills. Id. at 453. Plaintiff reported "[b]ack pain" and that she was "[d]oing a lot of lifting." Id.

## B. Conclusions of Law

A "disability" is defined by the Social Security Act as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. § 1382c(a)(3). A reviewing court's evaluation of the Commissioner's decision is based upon the

33

record made from the administrative hearing process. <u>Jones v. Sec'y, Health and Human Servs.</u>, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of review is limited to determination of (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. <u>Landsaw v. Sec'y of Health and Human Servs.</u>, 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Rogers v. Comm'r of Soc. Sec.</u>, 486 F.3d 234, 241 (6th Cir. 2007) (quoting <u>Cutlip v. Sec'y of Health & Human Servs.</u>, 25 F.3d 284, 286 (6th Cir. 1994)).

Plaintiff contends that the ALJ erred by: (1) failing to find that Plaintiff meets or medically equals Listing 12.05(B) or 12.05(C); (2) incorrectly considering opinion evidence; (3) failing to list all of Plaintiff's impairments and their severity; (4) failing to perform a function-by-function analysis for the RFC; (5) failing to consider Plaintiff's obesity; (6) failing to properly evaluate Plaintiff's statements for a credibility determination.

As to whether the ALJ erred by failing to find that Plaintiff met or medically equaled Listing 12.05(B) or 12.05(C). Listing 12.05 states:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ...
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;

34

OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Plaintiff's IQ score is recorded in two education records and both were made before Plaintiff reached the age of twenty-two. Listing 12.05(B) requires an IQ score of 59 or less. When considering this listing, the ALJ wrote: "the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less. Marshal County School records dated August 31, 1995, show the claimant achieved a verbal IQ score of 46, a performance IQ score of 70, and a full scale IQ score of 54 on September 9, 1992." (Docket Entry No. 10 at 15). The record specifies that Plaintiff's full scale IQ at the time was 54 +/- 3. Id. at 217. According to Social Security Regulations, "IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above." 20 C.F.R. pt. 404, 112.00D.10. Plaintiff was eleven years old on September 9, 1992 when the test was administered and was fourteen years old when the submitted record was made. As such, those results should be considered for only two years and are not valid for consideration now. Listing 12.05B is not met.

On March 9, 1998, Plaintiff participated in another IQ test. (Docket Entry No. 10 at 212-13). The ALJ wrote, "a psychological report dated March 9, 1998, shows the claimant achieved a verbal IQ score of 71, a performance IQ score of 83, and a full scale IQ score of 79 on the Wechsler Adult Intelligence Test – Revised (WAIS–R)." Id. at 15. The record specifies that Plaintiff "achieved a Full Scale I.Q. score of 79 +/- 3 on the WAIS–R, which places her at the Borderline Mentally Retarded level of intellectual functioning at the time of testing. Janie's Verbal and Performance I.Q.'s are not significantly different. Greater strength was indicated in her Performance skills (I.Q.

35

83 +/- 3) compared to her Verbal skills (I.Q. 71 +/- 3)." Id. at 212.

At the time of this IQ test, Plaintiff was seventeen years old. According to Social Security Regulations, "the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior." 20 C.F.R. pt. 404, 112.00D.10. As such, these results can be used to determine Plaintiff's condition under Listing 12.05(C).

Plaintiff asserts that because her verbal IQ was 71 +/- 3, it could have been as low as 68. An IQ of 68 would qualify under Listing 12.05(C). The Sixth Circuit has held that an IQ score within the range of error does not qualify a claimant for Listing 12.05(C). "[T]his court considered and rejected the 'margin of error' argument because the Commissioner's regulations do not provide for functional equivalency when test scores are specified." Newland v. Apel, 182 F.3d 918, 1999 WL 435153 at *6 (6th Cir. 1999). See also Kramer v. Comm'r of Soc. Sec., 2010 WL 1038660 at *6-7 (E.D. Mich. Jan. 14, 2010). In Plaintiff's record, test scores were specified as "Verbal I.Q.: 71," "Performance I.Q.: 83," and "Full Scale I.Q.: 79." (Docket Entry No. 10 at 212). As such, Plaintiff's IQ score does not fall within the range required for Listing 12.05(C). Further, Listing 12.05(C) has an additional requirement that a claimant have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." Plaintiff has not alleged any corresponding impairment to meet this criteria. The Court concludes that based upon the record, Plaintiff did not meet Listing 12.05(B) or 12.05(C).

Plaintiff's next claim is that the ALJ incorrectly weighed opinion evidence, because one of the records that the ALJ gave "significant weight" to was unsigned, and that the ALJ did not adopt the findings of that record. The ALJ found: "The opinions of State agency psychological consultants

Jane Dubios, Ph.D., and Rebecca Joslin, Ed.D., are given significant weight because they are generally consistent with the record as a whole (Exhibits 5F, 6F, 11F, and 12F)." Id. at 21. Exhibit 12F in the record is unsigned. Id. at 419. The previous record, Exhibit 11F, is a psychiatric review dated February 8, 2011 and signed by Rebecca P. Joslin, Ed.D. and Exhibit 12F is a mental RFC assessment also dated February 8, 2011. Id. at 403-19.

The ALJ is required to consider opinion evidence given by state agencies and to explain the weight given. "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants ... the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist[.]" 20 C.F.R. § 404.1527(e)(2)(i) and (ii). The ALJ assigned significant weight to the State agency opinions "because they are generally consistent with the record as a whole." (Docket Entry No. 10 at 21).

Although the opinion at Exhibit 12F is unsigned, the ALJ is not required to discard it. As stated above, the ALJ is required to consider the opinion of a State agency consultant, and although the opinion is unsigned it is labeled as State paperwork. The Court concludes that the ALJ did not err by considering the opinion given in Exhibit 12F.

To be sure, the ALJ assigned the opinion "significant weight." Yet, the ALJ did not rely solely on the unsigned opinion. The ALJ also gave "significant weight" to the opinions of Jayne Dubois, Ph.D. and to the signed opinion of Rebecca Joslin, Ed.D. Id. The ALJ also gave "great weight" to the opinion of medical consultant Dr. Steven Steinburg. Id. "[T]he ALJ clearly relied upon *all* the agency consultants in forming the Plaintiff's RFC, not just that of the 'unsigned report.'" Skinner v. Astrue, 2010 WL 1754173 at *9 (M.D. Tenn. April 30, 2010). The Court concludes that

the ALJ did not err by assigning "significant weight" to the unsigned opinion at Exhibit 12F.

Plaintiff's next claim is that because the ALJ gave significant weight to the unsigned opinion, the ALJ erred by failing to include all of the limitations listed in that opinion. The ALJ is not required to defer to the opinion of a medical consultant, even if the ALJ has given that opinion significant weight. "Under 20 CFR 404.1527(e) and 416.927(e), some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case ... The following are examples of such issues: ... 2. What an individual's RFC is[.]" SSR 96-5p. The Court concludes that the ALJ did not err by choosing not to adopt the restrictions in Exhibit 12F.

Plaintiff's next claim is that the ALJ erred by failing to consider properly all of Plaintiff's impairments and by failing to provide sufficient reasons for not finding these combined impairments to be severe. Plaintiff specifically refers to her diagnoses of incontinence and headaches. When asked at the hearing about her incontinence, Plaintiff responded that "[t]he one [doctor] that I had discussed that with, he had just told me to put my panty liners or whatever on until it got worse, and then I've never said anything else about it." (Docket Entry No. 10 at 46). When asked if she experienced this issue "all the time," Plaintiff responded that "[i]t's half worse, not, not real bad now, but, I mean, it still happens when I –." Id. Plaintiff also has three medical records that show treatment of incontinence. On August 18, 2009, Plaintiff complained of incontinence and was prescribed medication. Id. at 339. On August 17, 2010, Plaintiff again complained of incontinence and was again prescribed medication. Id. at 355. On September 10, 2010, Plaintiff complained of incontinence but was not prescribed medication. Id. at 356-57. Plaintiff cites three additional medical records in support of her claim but these records are illegible. Id. at 390, 422 and 636.

Plaintiff admitted that after mentioning this issue to her doctor, she "never said anything else about it." Id. at 46. Plaintiff also admitted that the doctor's suggested treatment was "just ... to put my panty liners or whatever," and that the doctor did not suggest medical intervention. Id. Plaintiff has not demonstrated that this issue should be considered a severe medical impairment. "If Plaintiff's incontinence was so severe, then objective medical evidence would indicate as much. Plaintiff had no apparent problem accessing medical treatment and [her] treatment records are entirely consistent with the view that Plaintiff's incontinence was a mild – but not severe – impairment." Birch v. Colvin, 2014 WL 2548113 at *3 (E.D. Ky. June 4, 2014). The Court concludes that the ALJ did not err in failing to find Plaintiff's incontinence to be a severe medical impairment.

Plaintiff also asserts that the ALJ did not properly consider Plaintiff's complaints of headaches. Plaintiff asserts that her headaches are "well documented" in the record. At the hearing, the ALJ asked, "[c]an you tell me where [Plaintiff is] reporting that [she has severe headaches] in the treatment records? I actually, when I was looking through, did not see many reports of headaches. And often when she did complain of headaches they all – they treated her for sinus infections ... at the same time ... I never saw a real correlation between – I saw where they did MRIs of [the] head when she complained of headaches, but they ultimately treated a sinus infection." (Docket Entry No. 10 at 45). Plaintiff's attorney cited five records contained within Exhibit 3F. Id. The ALJ responded, "[a]nd that's a span of ten years in 3F." Id. Plaintiff's attorney stated, "I mean, she has complained of them. I'm not sure there's mention of any kind of frequency of those headaches, but she has complained of them." Id.

The ALJ found that Plaintiff "also testified she has a brain tumor, and she has severe

headaches." <u>Id.</u> at 18. Yet, the ALJ also stated:

> The claimant's medical records, diagnostic tests, and clinical presentations are inconsistent with severe, disabling headaches and symptoms from her pericallosal lipoma.
> ...
> Furthermore, medical records dated April 15, 2009, show that the claimant's neurologist concluded the claimant's [headaches] were due to tension. Medical records dated August 18, 2009, show the claimant's tension headaches were stable with medication. Additionally, medical records dated February 23, 2011, show the claimant stated she felt well. Medical records dated May 10, 2011, show the claimant stated she was doing well, and her medications were working. Finally, medical records dated July 12, 2011, show the claimant reported she was feeling well, and her head was normal upon examination.

<u>Id.</u> at 19 (citations omitted).

Finally, the ALJ also noted a concern regarding Plaintiff's use of narcotics prescription drugs to treat her headaches.

> Additionally, the record indicates that the claimant has been prescribed and has taken narcotic pain medication for her back pain and headaches, which would typically weigh in favor of the credibility of the claimant's allegation. However, the record indicates that the claimant has a history of inappropriately using her narcotic pain medications, which raises some question as to whether the claimant's use of narcotic pain medication is solely to manage her back pain and headaches. For instance, medical records dated August 18, 2009, indicate that the claimant may have been selling her medications, and her urine drug screen (UDS) was negative for prescribed opiods. Furthermore, medical records dated March 11, 2010, and October 14, 2010, show the claimant was fired from pain management.

<u>Id.</u> at 21 (citations omitted).

Yet, the ALJ clearly assigned some credibility to Plaintiff's complaints. The ALJ gave "little weight" to the opinion of Dr. Gumbinas because he "opined that the claimant had no severe physical impairments, which is overly optimistic in light of the claimant's subjective complaints of headaches, her diagnosis of tension headaches, and the MRI of the claimant's brain[.]" <u>Id.</u> (citations omitted).

The ALJ considered Plaintiff's testimony and weighed it against the evidence in the record to determine that Plaintiff's headaches were not as severe as she asserted. When analyzing a claimant's subjective complaints, the ALJ must consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. See Felisky v. Bowen, 35 F.3d 1027, 1039 (6th Cir. 1994) (construing 20 C.F.R. § 404.1529(c)(3)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. See, e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997); Blacha v. Sec'y of Health and Human Serv., 927 F.2d 228, 230 (6th Cir. 1990); and Kirk v. Sec'y of Health and Human Serv., 667 F.2d 524, 538 (6th Cir. 1981). Here, the Court concludes that the ALJ considered all relevant factors and determined that Plaintiff's headaches were not a severe impairment.

Next, Plaintiff asserts that the ALJ erred by failing to complete a function-by-function assessment in the RFC. Specifically, Plaintiff asserts that the ALJ did not provide a limitation for pushing and pulling and that this ability would be limited due to her severe impairment of central disc protrusion with neural foraminal narrowing at L5-S1. The ALJ cited this impairment twice. First, regarding Plaintiff's back pain, the ALJ wrote, "a CT of the claimant's lumbar spine dated October 18, 2011, shows the claimant had central disc protrusion with only 'mild' neural foraminal narrowing at L5-S1." (Docket Entry No. 10 at 19). The ALJ also discounted Dr. Medina's opinion that Plaintiff had no severe back impairment by writing, "Dr. Medina opined that the claimant had

41

no severe back impairment, which is overly optimistic in light of the claimant's subjective complaints of back pain, and the CT of the claimant's lumbar spine dated October 18, 2011, showing she had central disc protrusion at L5-S1." Id. at 21.

Plaintiff did not allege a pushing and pulling restriction, and no treatment provider limited Plaintiff in this way. On April 1, 2011 examiner John Schlamp completed a vocational analysis worksheet. Id. at 193-95. In the section for exertional limitations, the instructions say "check ONLY restricted items." Id. at 193. Schlamp did not check any limitations for Plaintiff's ability to push or pull. Id. Another vocational analysis worksheet, completed on December 8, 2010 by examiner K. Garcia, similarly does not have any limitations checks for Plaintiff's ability to push or pull. Id. at 171-73.

Social Security Regulation 96-8p requires an ALJ to perform a function-by-function evaluation of a claimant before establishing an exertional level. SRR 96-8p states, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Yet, an ALJ is not required to analyze limitations that have not been alleged. "Although SSR 96-8p requires a 'function-by-function evaluation' to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged." Delgado v. Comm'r of Soc. Sec., 30 F. App'x 542, 547 (6th Cir. 2002) (see also Collette v. Astrue, 2009 WL 32929 at *8 (E.D. Tenn. Jan. 6, 2009)). Further, "'[a]lthough a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing,' as there is a difference 'between

42

what an ALJ must consider and what an ALJ must discuss in a written opinion.'" Burke v. Comm'r of Soc. Sec., 2014 WL 2895460 at *10 (E.D. Tenn. June 25, 2014) (quoting Delgado, 30 F. App'x at 547). The Court concludes that the ALJ did not err in failing to list a limitation when Plaintiff has not alleged such a limitation.

Plaintiff's next claim is that the ALJ erred by failing to consider properly Plaintiff's obesity. The ALJ did list obesity as one of Plaintiff's severe impairments. (Docket Entry No. 10 at 14). Regarding Plaintiff's obesity, the ALJ found:

> The claimant's noncompliance with prescribed treatment is inconsistent with severe, disabling symptoms from her obesity. For instance, medical records dated December 9, 2008, show the claimant was obese (249 pounds), and she was counseled to lose weight, diet, and exercise. However, medical notes dated June 19, 2012, show the claimant was noncompliant with such prescribed treatment by not losing weight, and in fact, the claimant had gained weight (260 pounds). Furthermore, the undersigned notes that the above-stated residual functional capacity is consistent with exercise and weight loss, which is the treatment prescribed for the claimant's obesity.

Id. at 19.

Social Security Regulation 02-1p describes how to consider a claimant's obesity in determining eligibility for Social Security benefits. Yet "Social Security Ruling 02-01p does not mandate a particular mode of analysis. It only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations. It is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants." Bledsoe v. Barnhart, 165 F. App'x 408, 411-12 (6th Cir. 2006).

Plaintiff does not specifically allege any limitation based on her obesity, nor any limitation that is worsened by her obesity. Further, none of Plaintiff's treating or reviewing physicians listed any limitation due to Plaintiff's obesity. Several health care providers instructed Plaintiff on the

importance of losing weight, diet, and exercise. (Docket Entry No. 10 at 311, 355, 357, 359, 611). Plaintiff also expressed concern about her weight. Id. at 327. When completing function reports, Plaintiff herself did not state her obesity limited her in any way. Id. at 155-66, 185-92. Upon consideration of the evidence, the Court concludes that substantial evident supports the ALJ's determination that Plaintiff's obesity did not establish a limitation in Plaintiff's ability to work.

Finally, Plaintiff asserts that the ALJ erred in her consideration of Plaintiff's credibility. Plaintiff asserts that instead of using the criteria in Social Security Regulation 96-7p, the ALJ made "conclusory statements" regarding Plaintiff's credibility. The ALJ dedicated three pages to her discussion of Plaintiff's credibility. The ALJ found that several records were inconsistent with Plaintiff's claims, as has been discussed previously. The ALJ found that Plaintiff's medical records, Plaintiff's history of noncompliance with treatment, Plaintiff's education records, and Plaintiff's admitted activities of daily living were inconsistent with her claims of severe, disabling symptoms. Further, the ALJ noted Plaintiff's history of inappropriately using narcotic drugs, including Dr. Kenneth Phelps' suspicion that Plaintiff was selling her medications. In addition, on multiple occasions, Plaintiff's case managers noted the absence of any medication bottles at Plaintiff's residence.

In evaluating the entirety of the evidence, the ALJ must weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. Walters, 127 F.3d at 531; Kirk, 667 F.2d at 538. An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. Walters, 127 F.3d at 531 (citing Villarreal v. Sec'y of Health and Human Serv. 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is

appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. Id. If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony, and the reasons must be supported by the record. See Felisky, 35 F.3d at 1036; King v. Heckler, 742 F.2d 968, 975 (6th Cir. 1984). Here, the ALJ thoroughly discussed her reasons for discounting Plaintiff's claim. The Court concludes that the ALJ's finding on Plaintiff's credibility is supported by substantial evidence.

For these reasons, the Court concludes that the ALJ's decision is supported by substantial evidence and should be affirmed and that Plaintiff's motion for judgment on the record (Docket Entry No. 12) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ___ day of February, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge